1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10  GAMETEK LLC,                              CASE NO. 12-CV-501 BEN (RBB)
11                              Plaintiff,    **CLAIM CONSTRUCTION ORDER**
12        vs.
    FACEBOOK, INC.; et al.,
13                              Defendants.
14

15        In this patent infringement action, the parties seek construction of ten claim
16  terms, as well as dispute the order of the claim elements in three claims, found in U.S.
17  Patent No. 7,076,445.  Having considered the papers filed by the parties and oral
18  argument, the Court construes the terms as follows.

19                              **BACKGROUND**
20        Plaintiff GameTek LLC is the assignee of the entire right, title, and interest in
21  U.S. Patent No. 7,076,445 ("the '445 patent"), entitled "System and Methods for
22  Obtaining Advantages and Transacting the Same in a Computer Gaming Environment."
23  The '445 patent relates to the creation, use, and selling of "advantages" within a
24  gaming context.  (*See* '445 patent, at Abstract, 11:54-14:62.)  In the context of the '445
25  patent, "an advantage is a feature or element within an environment that one is not
26  intended to have or does not normally have access to that provides an edge in
27  overcoming a presented challenge."  (*Id.* at 1:33-36.)
28        According to the specification, "gaming enthusiasts are willing to pay for the

opportunity to obtain an advantage." (*Id.* at 1:54-55.)  At the time of invention, "there [we]re no comprehensive systems and methods for the creation, integration, and transaction of advantages."  (*Id.* at 2:20-22.)  Rather, gaming enthusiasts found advantages by "searching for free shortcuts and tricks (i.e. advantages) in on-line chat rooms . . . or [] purchas[ing] and subscrib[ing] to publications" in the gaming context. (*Id.* at 2:23-25.)

The '445 patent relates to methods of selling game objects that confer benefits on the purchaser in a computer game.  (*See id.* at 11:54-58, 13:34-48, 14:8-12.) Examples of such game objects include "weapons," "ammunition," "skill," "information about the game environment," and "ability to speed." (*Id.* at 13:17-23.) The patent claims a computer program that permits creation of a user account, maintains a balance of real or virtual currency, and collects and stores demographic information. (*See id.* at 11:61-63, 13:41-42, 14:17-18.)  The program tailors offers to purchase game objects based on tracked activity, the current game environment, and the user's demographics. (*See, e.g.*, *id.* at 11:59-60, 12:13-19.)

In addition, the '445 patent claims a method for creating, transacting in, and integrating game objects, which generally requires the following steps: (1) determining the user's eligibility to purchase an item by allowing the user to select an object, setting the purchase price of the object (potentially determined by the user's prior purchase history or actions), and comparing the user's account balance to the price of the object; (2) displaying the purchase price of the object; (3) presenting the user with an offer to purchase the object; (4) permitting the user to purchase the object without interrupting the user's playing of the game; and (5) incorporating the purchased object into the game without interrupting the user's playing of the game.  (*See id.* at 11:67-12:27, 13:43-64, 14:15-39; *see also id.* at 2:65-3:3, 3:20-44, 3:54-58, 5:35-38, 6:21-26, 6:40-48.)

GameTek brings this action for infringement of the '445 patent.  Specifically, GameTek asserts claims 1, 2, 4, 12, 13, 14, 15, and 17 against Defendant Big Viking

Games Inc. f/k/a Tall Tree Games. GameTek originally brought suit against 21 defendants. Big Viking Games is the only remaining defendant, as all other defendants have been either dismissed or severed from the action.

The parties have submitted competing constructions for ten claim terms found in the '445 patent. In addition, the parties dispute the order of the claim elements in claim 1, claim 15, and claim 17.

## DISCUSSION

### I. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Courts determine the meaning of disputed claim terms from the perspective of a person of ordinary skill in the art at the time the patent is filed. *Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). Claim terms "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted).

When construing claim terms, the court should first look to sources in the intrinsic record. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). First, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Second, the claims "must be read in view of the specification, of which they are a part." *Id.* at 1315 (internal quotation marks omitted). The specification is usually "dispositive," as "it is the single best guide to the meaning of a disputed term." *Id.* (internal quotation marks omitted). Third, the court should consider the patent's prosecution history, which is the record of proceedings before the Patent and Trademark Office ("PTO") and includes the prior art cited during the patent examination. *Id.* at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of

the specification and thus is less useful for claim construction purposes." *Id.*

If the intrinsic evidence resolves the ambiguity in the disputed claim terms, then "it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583. If ambiguities in the claim terms remain, however, courts may consider extrinsic evidence. *Id.* at 1584. Extrinsic evidence includes expert testimony, inventor testimony, dictionaries, and scientific treatises. *Phillips*, 415 F.3d at 1317.

## II. THE '445 PATENT

The parties have submitted competing constructions for ten claim terms found in the '445 patent. In addition, the parties dispute the order of the claim elements of claim 1, claim 15, and claim 17. Each claim term and set of claim elements will be addressed in turn.

### A. "gaming action"

The parties dispute the term "gaming action." The parties propose the following constructions. The Court's adopted construction is highlighted.

| Term | GameTek's Proposed Construction | Big Viking Games's Proposed Construction | Court's Adopted Construction |
|------|--------------------------------|------------------------------------------|------------------------------|
| "gaming action" | Ordinary meaning; no construction necessary.<br><br>Alternatively, acts, activities or things done that are part of the game. | "the user's playing of the game" | "the game being played" |

The Court will first address "gaming action." This term is used in independent claims 1, 15, and 17, and in dependent claims 2, 9, 10, 16, and 18. Claim 1 is representative:

A method of managing the operation of a game which . . . is programmed to control a *gaming action* for at least one of a plurality of users, said managing method using a programmed computer to effect the following steps:

a) tracking the activity of the at least one user in the course of the *gaming action*;
. . .
e) presenting to the at least one user an offer to purchase the game object dependent upon a group of game parameters comprising the tracked activity of the at least one *gaming action* of the at least one user . . .
f) permitting the at least one user to purchase the at least one game object at the set purchase price without interrupting the *gaming action* of the at least one user; and
g) supplying the at least one purchased game object to the at least one user without interrupting the *gaming action* of the at least one user . . . .

('445 patent, at 11:54-12:26 (emphasis added).)

During the claim construction hearing, the parties agreed that the term "gaming action" should be construed as "the game being played." (Hearing Tr. [Docket No. 210], at 8-9, 11.) The parties disagreed only as to whether the purchase of a game object is part of the "gaming action." (*Id.* at 9.) Big Viking Games argued that it is not part of the gaming action, while GameTek argued that it is. (*Id.* at 9, 11-12.) Because the parties agreed that only this one dispute remains, the Court will address only the arguments relating to whether the purchase of a game object is part of the gaming action.

The Court finds that the purchase of a game object is not part of the gaming action. The claim language distinguishes between gaming action and the purchase of a game object. For instance, claim 1 provides: "f) permitting the at least one user to *purchase* the at least one game object at the set purchase price without interrupting the *gaming action* of the at least one user." ('445 patent, at 12:20-22 (emphasis added); *see also, e.g.*, *id.* at 8:23-25 (distinguishing between "gaming content" and "advantages dialog box" in Fig. 2).) "Gaming action" cannot interrupt itself, so purchasing a game object must be distinct from "gaming action." *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) (to maintain "internal coherence . . . the use of two terms in a claim requires that they connote different meanings").

In addition, the prosecution history supports this construction. In the Notice of Allowability, the patent examiner explained how the '445 patent could be distinguished

1    from the prior art.  The notice provided:

2    

3        Some of the prior art gaming systems offer 'continuation' where play is
         resumed after a loss of game lives (e.g. SoulCalibur), an options screen
         where a player can obtain new gaming objects (e.g. Age of Empires), and/or
4        an in-game object select option (e.g. Shrek 2).  None of these systems,
         however, disclose offering a game object to a user for a price and allowing
5        said user to access and incorporate said object in a game *without
         interrupting the game*. . . .
6            To one of ordinary skill . . . the closest prior art teaching to
         Applicant's claims is a combination of the Martinez et al., Roskowski et al.,
7        and Heckel teachings where a user is presented, in a game environment,
         with an ad for a game object based on gameplay, the user downloads the
8        object and the object is incorporated into the game.  However, the instant
         invention is distinguished from the prior art singly or in combination as the
9        system tracks a user's gaming action, the system determines whether a user
         is eligible to purchase a game object based on the user's account balance,
10       the system presents an offer to the user to purchase the game object based
         on at least said tracked gaming action, *the user purchases and is supplied
11       with the game object without interrupting the gaming action*, and the object
         is incorporated into the game.

12   

13   (Gaedt Decl., Exh. C, at 4-6 (emphasis added).)  This shows that the '445 patent could

14   be distinguished from the prior art based on the way the user could purchase and be

15   supplied with game objects without interrupting the gaming action, among other things.

16   As discussed above, because "gaming action" cannot interrupt itself, purchasing a game

17   object must be distinct from "gaming action."

18        GameTek argues that there are examples of purchasing in the specification that

19   are part of the gaming action.  First, GameTek points to the section of the specification

20   that provides that "in a simulation role playing game, real world products and/or

21   services advertisements may be integrated in the game's landscape such that *a user may

22   interact with the cyber world advertisements to transact real world products and/or

23   services*." ('445 patent, at 8:57-62 (emphasis added).)  As an example of this, the user

24   can enter the ABC Pizza Shop in order to purchase ABC Pizza.  The ABC Pizza Shop

25   is referred to as "interactive content 405" in the specification.  (*Id.* at 8:66.)  According

26   to GameTek, this means that the action of the game includes "interaction" with ABC

27   Pizza Shop.

28        In the same vein, GameTek points to Figure 2 and Figure 4A.  Both figures are

"screen shots that display various features of the advantages and interactive advertisements system." (*Id.* at 8:18-20.) Specifically, they are examples of how a user may be offered the opportunity to purchase more ammunition in a shooting game. In Figure 2, a dialogue box appears asking the user if he or she would like to purchase additional ammunition. The specification describes Figure 2 as depicting an "interactive game" comprising an "interactive advertisements system" embodied in advantages dialogue box 210. (*Id.* at 8:20-38.) In regards to Figure 4, the specification provides that "[a]s the participating user runs low on ammunition (or some other condition), advantages information 425 is displayed to offer advantages to the participating user. As such, the advantage is integrated into computing application 413 . . . ." (*Id.* at 9:28-41.)

It is true that the above examples demonstrate that advertisements may consist of interactive content and therefore be part of the gaming action. Big Viking Games, however, does not argue that the presentation of advertisements during game play is not gaming action. The claims are not directed toward the presentation of advertisements, but rather the ability to acquire a game object by conducting a real-time transaction. That is, the claims do not require that advertisements be presented without interrupting the game; the claims require only that users be able to purchase a game object without interrupting the gaming action.

Accordingly, "gaming action" shall be construed as "the game being played." "Gaming action" does not include the purchase of game objects.

### B. "interrupting" terms

The parties dispute the "interrupting" terms. The parties propose the following constructions. The Court's adopted constructions are highlighted.

///

///

///

///

| Term | GameTek's Proposed Construction | Big Viking Games's Proposed Construction |
|---|---|---|
| "interrupting the gaming action of the at least one user" | Ordinary meaning; no construction necessary.<br><br>Alternatively, interrupting the gaming action while the user is interacting with the game. | "causing or making a break in the user's ability to continue playing the game" |
| "interrupting" | Ordinary meaning; no construction necessary.<br><br>Alternatively, ceasing or stopping for a period of time. | "causing or making a break in the user's ability to continue" |
| "permitting the at least one user to purchase the at least one game object . . . without interrupting the gaming action of the at least one user" | See constructions re: "purchase," "gaming action," and "interrupting."<br><br>Otherwise, ordinary meaning; no construction necessary. | "permitting a user to purchase a game object without causing or making a break in the user's ability to continue playing the game" |
| "supplying the at least one purchased game object to the at least one user without interrupting the gaming action of the at least one user" | See constructions re: "purchase," "gaming action," "interrupting," and "interrupting the gaming action of the at least one user."<br><br>Otherwise, ordinary meaning; no construction necessary. | "supply the . . . game object to the user without causing or making a break in the user's ability to continue playing the game" |
| "ordering the at least one selected game object without interrupting the gaming action of the at least one user" | See constructions re: "action," "gaming action," and "interrupting."<br><br>Otherwise, ordinary meaning; no construction necessary. | "ordering a game object without causing or making a break in the user's ability to continue playing the game" |

At the hearing, the parties agreed that the term "interrupting" does not need to

be construed by the Court.  (Hearing Tr. [Docket No. 210], at 58-59.)  They agreed that the only disagreements between the parties in regards to "interrupting" relate to the parties' proposed construction of "gaming action," discussed above.  (*Id.* at 61.)  The constructions of the remaining "interrupting" term phrases relate to the constructions of the individual terms that make up the phrase, such as "purchase," "gaming action," "interrupting" and "interrupting the gaming action of the at least one user."

Accordingly, the Court declines to construe the terms "interrupting the gaming action of the at least one user" and "interrupting."  The construction of the term "permitting the at least one user to purchase the at least one game object . . . without interrupting the gaming action of the at least one user" depends on the Court's constructions for "purchase," "gaming action," and "interrupting."  The construction of the term "supplying the at least one purchased game object to the at least one user without interrupting the gaming action of the at least one user" depends on the Court's constructions for "purchase," "gaming action," "interrupting," and "interrupting the gaming action of the at least one user."  The construction of the term "ordering the at least one selected game object without interrupting the gaming action of the at least one user" depends on the Court's constructions for "action," "gaming action," and "interrupting."

## C. "the at least one user having a set of demographics" / "set of demographics"

The parties dispute the terms "the at least one user having a set of demographics" and "set of demographics."  The parties propose the following constructions.  The Court's adopted constructions are highlighted.

///

///

///

| Term | GameTek's Proposed Construction | Big Viking Games's Proposed Construction |
|---|---|---|
| "the at least one user having a set of demographics" | "the at least one user has a set of characteristics such as age or sex" | "the account maintains two or more types of statistical characteristics (such as age, sex, or income) associated with the user" |
| "set of demographics" | "the one set of characteristics such as age or sex" | "two or more types of statistical characteristics (such as age, sex, or income) associated with the user" |

As a preliminary matter, the Court finds that there is no meaningful dispute between the parties in regards to the term "demographics." GameTek proposes the term be construed as "characteristics such as age or sex" while Big Viking Games proposes the term be construed as "statistical characteristics (such as age, sex, or income)." These constructions are substantively the same.

First, the term "the at least one user having a set of demographics" appears in claim 1(b): "permitting the at least one user to create an account for receiving a consideration of the at least one user, *the at least one user having a set of demographics*." ('445 patent, at 11:61-63 (emphasis added).) The parties dispute whether the demographic information needs to be stored, and if so, where. The Court finds that the disputed element requires that the demographics of the user be stored in the user's account.

A function of the demographic information is contemplated. Claim 1(e) provides: "presenting to the at least one user an offer to purchase the game object dependant upon a group of game parameters comprising the tracked activity of the at least one gaming action of the at least one user and, the one game environment or the one set of demographics of the at least one user." (*Id.* at 12:13-19.) In order for an offer to purchase a game object to depend on the user's demographics, they must be

known and accessible to the game. To accomplish this, the demographics associated with the user must be stored.

The specification supports this construction. For instance, the patent discloses that "this system may track and store participating user's advantages information such as demographic information, buying habits preferences and tastes." (*Id.* at 6:12-15.) In addition, Figure 5 is a flow chart of the claimed method. In this figure, the steps flow as follows: "Create Account?", followed by "Procure User Demographic and Payment Method Information," followed by "Create User Profile Information (For Use by Interactive Advertisements)." The description of Figure 5 states that if it is determined that the user does not have an account and would like to create one, "processing proceeds to block 555 where user demographic and payment information is procured." (*Id.* at 10:14-16.)

Moreover, the demographic information is stored in the user's account. The phrase "set of demographics" occurs in claim 1(b), which also discusses the creation of a user account. (*Id.* at 11:61-63.) This indicates that the demographic information is stored in the account, rather than the user profile, as GameTek asserts. Accordingly, the term "the at least one user having a set of demographics" shall be construed as "the account maintains two or more types of statistical characteristics (such as age, sex, or income) associated with the user."

Second, the term "set of demographics" appears in claim 1(e): "presenting to the at least one user an offer to purchase the game object dependent upon a group of game parameters comprising the tracked activity of the at least one gaming action of the at least one user and, the one game environment or the one set of demographics of the least one user." (*Id.* at 12:14-19.) The parties dispute whether a "set of demographics" requires the use of a single piece of demographic information about the user (GameTek's position), or whether it requires the use of two or more pieces of demographic information (Big Viking Games's position).

The ordinary meaning of the term "set" is "two or more." *See, e.g.*, *Mueller Sports Med., Inc. v. Core Prod. Int'l, Inc.*, No. 02-C-445-C, 2003 WL 23200261, at *3 (W.D. Wis. Mar. 3, 2003) ("Common-sense definition" of "set" is "two or more"); *Ergo Licensing LLP v. Carefusion 303, Inc.*, 744 F. Supp. 2d 381, 385 (D. Me. 2010) ("[S]et ordinarily refers to a collection, that is, two or more, when it precedes and describes a plural noun."). In addition, the patentee's decision to use the plural form "demographics"—as opposed to "demographic"—supports Big Viking Games's proposed construction. *See, e.g.*, *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 658 F. Supp. 2d 1208, 1222 (S.D. Cal. 2009) (holding that a "set of codes" must mean more than one code, given the patent's use of the plural of "code"). The term "demographics" refers to more than one piece of demographic information. *See, e.g.*, Gaedt Decl., Exh. K (Webster's II New College Dictionary (2001) ("demographics": "*n. (pl. in number)*. Demographic data . . . .").

The dictionary definitions that GameTek offers in support of its argument that "set of demographics" requires the use of a single piece of demographic information do not define the ordinary meaning of the term "set." Rather, these dictionary definitions present a specialized meaning of "set" used in the context of mathematics. (*See* Pl. Op. Br. at 17, n.44.) These dictionary definitions are not relevant here, as the disputed term is not used in a mathematical sense.

Accordingly, "set of demographics" shall be construed as "two or more types of statistical characteristics (such as age, sex, or income) associated with the user."

### D. "ordering"

The parties dispute the term "ordering." The parties propose the following constructions. The Court's adopted construction is highlighted.

///

///

| Term | GameTek's Proposed Construction | Big Viking Games's Proposed Construction |
|------|-------------------------------|----------------------------------------|
| "ordering" | Ordinary meaning, no construction necessary. | "the system placing an order for an object from a third party" |

The term "ordering" is found in claim 15: "A method of . . . using a programmed computer to effect the following steps: . . . (g) ordering the at least one selected game object without interrupting the gaming action of the at least one user." ('445 patent, at 13:34-59.)   The Court finds that Claim 15 is unambiguous—it requires that a programmed computer be used to order a selected game object, which is supplied to the user.

Big Viking Games presents several arguments in support of construing "ordering" as "placing an order for an object from a *third party*."  First, Big Viking Games argues that the claims and specification distinguish between "ordering" on one hand, and "purchasing," "supplying," and "commitment to purchase" on the other hand. Even assuming that the term "ordering" must have a distinct meaning from "purchasing," "supplying," and "commitment to purchase," it does not follow that the object must be ordered from a third party.

Second, Big Viking Games argues that the system must order an object from somewhere other than itself because "the system 'ordering' an object autonomously from itself is illogical and defies the plain meaning of that term." (Def. Op. Br. at 18.) Big Viking Games argues that the only part of the specification that discusses "ordering" is in the context of the system placing an order for a real-world product—pizza. (*See* '445 patent, at 8:53-9:13.) According to Big Viking Games, this shows that the order must be placed to a third party.  The specification makes clear, however, that purchasing real-world objects is only one example of how users may purchase a variety of products and services.  (*See id.* at 8:53-62 ("Alternatively, the present invention may offer users interactive advertisements by which users can

purchase a variety of products or services. . . . *For example*, in a simulation role playing game, real world products and/or services advertisements may be integrated in the game's landscape such that a user may interact with the cyber world advertisements to transact real world products and/or services." (emphasis added)).)   Even assuming that Big Viking Games is correct that an order for real-world pizza must be placed to a third party, this does not mean that all orders must be for real-world products and placed with third parties.  Orders may also be filled from the inventory of the computer managing the game.

Accordingly, no construction of the term "ordering" is necessary.

### E. "purchase" and "consideration"

The parties dispute the terms  "purchase" and "consideration."  The parties propose  the  following  constructions.   The  Court's  adopted  constructions  are highlighted.

| Term | GameTek's Proposed Construction | Big Viking Games's Proposed Construction |
| --- | --- | --- |
| "purchase" | "To obtain using various currency means, including credit cards, e-cash, e-gold, other Internet enabled currency, and secondary monetary sources, such as, charges to phone or utility bill, transferring credit on pre-paid phone cards, or transit passes, or through conventional payment methods, such as checks, money-orders or cash" | "to obtain using consideration, i.e. real or virtual currency or equivalents usable for in-game transactions" |
| "consideration" | "That which is used to make a purchase within the game.  See above re: purchase." | "real or virtual currency or equivalents usable for in-game transactions" |

In regards to "purchase," the specification recites that "[u]sing the present

invention, participating users have the ability to '*purchase*' these environmental features or elements using various currency means, including credit cards, e-cash, e-gold, other Internet enabled currency, and secondary monetary sources, such as, charges to phone or utility bill, transferring credit on pre-paid phone cards, or transit passes, or through conventional payment methods, such as checks, money-orders or cash." (*Id.* at 3:11-18, 9:56-64 (emphasis added).)

GameTek's proposed construction of "purchase" is taken verbatim from the claim language. Big Viking Games's proposed construction, on the other hand, improperly adds "virtual currency" to the term's construction. The term "virtual currency" is not found in the specification or claims. Big Viking Games has not shown that "virtual currency" has an ordinary meaning to persons of ordinary skill in the art.

Big Viking Games argues that its proposed construction should be adopted because the list of currency means laid out in the specification is not comprehensive. According to Big Viking Games, the use of the word "including" signifies that the meaning of "currency" is not limited to what is listed. *See* Manual of Patent Examining Procedure § 2111.03 ("The transitional term 'comprising', which is synonymous with 'including,' 'containing,' or 'characterized by,' is inclusive or open-ended and does not exclude additional, unrecited elements or method steps."). The Court agrees that the list is not comprehensive, but this does not require that the Court adopt Big Viking Games's proposed construction. As GameTek acknowledges, its proposed construction is not a comprehensive list of currency means. (Hearing Tr. [Docket No. 210], at 33; Pl. Slides at 20.) Like the claim language, GameTek's proposed construction uses the term "including," which is an open-ended term. Accordingly, the term "purchase" shall be construed as "To obtain using various currency means, including credit cards, e-cash, e-gold, other Internet enabled currency, and secondary monetary sources, such as, charges to phone or utility bill, transferring credit on pre-paid phone cards, or transit passes, or through conventional payment methods, such as checks, money-orders or

cash."

In regards to "consideration," the parties agree that the term "consideration" is inextricably intertwined with the term "purchase." (Hearing Tr. [Docket No. 210], at 39-40.) Accordingly, the term "consideration" shall be construed as "That which is used to make a purchase within the game. See above re: purchase."

## F. "at least one user has made a commitment of consideration"

At the claim construction hearing, the parties agreed to construe the term "at least one user has made a commitment of consideration" as "the user has indicated a willingness to exchange consideration to purchase a selected object." (Hearing Tr. [Docket No. 210], at 46.) Accordingly, the Court adopts this construction.

## G. "account"

The parties have agreed that (1) the account with the "account balance" in claim element 1(c)(iii), is the same account created in claim element 1(b); (2) the account with the "account balance" in claim element 15(e) is the same account created in claim element 15(b); and (3) the account in claim elements 17(e) and 17(f) is the same account created in claim element 17(c). (*See* Pl. Op. Br. at 12; Def. Op. Br. at 4 n.2.)

## H. "permitting the at least one user to create an account for receiving a consideration of the at least one user, the at least one user having a set of demographics"

The parties dispute the term "permitting the at least one user to create an account for receiving a consideration of the at least one user, the at least one user having a set of demographics." The parties propose the following constructions. The Court's adopted construction is highlighted.

///

///

///

| Term | GameTek's Proposed Construction | Big Viking Games's Proposed Construction |
|------|--------------------------------|------------------------------------------|
| "permitting the at least one user to create an account for receiving a consideration of the at least one user, the at least one user having a set of demographics." | See Plaintiff's proposed constructions re: "consideration," "set of demographics," and "demographics." Otherwise, ordinary meaning, no construction necessary. | "permitting the at least one user to create an account for receiving a consideration balance, where the account maintains two or more types of statistical characteristics (such as age, sex, or income) associated with the user."[1] |

The parties agree that this claim term is comprised of narrower terms—"account," "consideration," "set of demographics," and "the at least one user having a set of demographics"—that have been separately construed by the Court above. Consistent with the Court's adopted constructions discussed above, the term "permitting the at least one user to create an account for receiving a consideration of the at least one user, the at least one user having a set of demographics" shall be construed as "permitting the at least one user to create an account for receiving a consideration balance, where the account maintains two or more types of statistical characteristics (such as age, sex, or income) associated with the user."

### I.  Order of the Claim Elements

Where a method claim does not explicitly recite an order that the method steps need to be performed in, courts determine whether the "method steps implicitly require that they be performed in the order written" because of the plain claim language, logic, or grammar. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003).

_____

[1] Big Viking Games originally proposed a construction that used the word "storing" in place of "receiving." Big Viking Games later agreed to use the word "receiving" in its proposed construction after GameTek objected to "storing." (Def. Resp. Br. at 12.)

A sequence may be grammatically required, for example, where a given step refers to something already performed in the previous step or uses the past tense to refer to actions described in previous steps. *See, e.g.*, *Combined Sys., Inc. v. Def. Tech. Corp. of Am.*, 350 F.3d 1207, 1212 (Fed. Cir. 2003).  If the plain claim language, grammar, or logic require that the method steps be performed in the order written, intrinsic evidence is only reviewed to determine that there is no deviation from this interpretation.  *Interactive Gift Express*, 256 F.3d at 1343; *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc*., 152 F.3d 1368, 1376 (Fed. Cir. 1998).

The parties dispute whether the claim elements 1(c)(i)-(c)(iii), 15(c)-(e), and 17(d)-(f) must be performed in the order they appear.  Each set of claim elements will be addressed in turn.

### 1.  Order of Steps in Claim 1(c)

The parties dispute whether the claim elements 1(c)(i)-(c)(iii) must be performed in the order they appear.  The Court's adopted construction is highlighted.

| Term | GameTek's Proposed Construction | Big Viking Games's Proposed Construction |
|---|---|---|
| Claim element 1(c) | **order of claim elements:** Claim element 1(c)(ii) must precede 1(c)(iii). There is no requirement that any other cited elements be performed in any particular order. | **order of claim elements:** Claim elements 1(c)(i)-(iii) must be performed in the order they are written. |

Claim 1 provides:

A method . . . using a programmed computer to effect the following steps: . . .

c) determining the eligibility of the at least one user to purchase at least one of a plurality of game objects, said eligibility determining comprises the following sub steps:

i) permitting the at least one user to select the at least one game object,

ii) setting the purchase price of the at least one game object, and

iii) comparing the account balance of the at least one user's consideration

with the set price of the at least one game object and, determining if the balance of the user's consideration is not less than the set price, determining the at least one user to be eligible to purchase the at least one game object.

('445 patent, at 11:54-12:10.**)**

Big Viking Games argues that as a matter of grammar and plain claim language, claim elements 1(c)(i)-(c)(iii) must be performed in the order they are written. GameTek does not dispute that the element (c)(ii) precedes element (c)(iii) in Claim 1. However, GameTek argues that Big Viking Games's position that element (c)(i) must precede element (c)(ii) or (c)(iii) is erroneous.

The Court finds that consistent with GameTek's proposed construction, the user is permitted to "select" the "game object," before, at the same time as, or after a purchase price is set and a determination is made whether the user is eligible to purchase the game object. Nothing in the '445 patent requires that prices be compared only for game objects selected by the user. A game may compare prices and accounts prior to the purchase decision so that users can select only those game objects for which they have sufficient consideration to purchase.

First, Big Viking Games argues that the antecedent basis for the game object in element (c)(ii) is the game object in element (c)(i). In other words, according to Big Viking Games, because "*the* at least one game object" does not exist before element (c)(i), the purchase price of "*the* at least one game object" cannot be set before the game object is selected in element (c)(i). However, elements (c)(i) and (c)(ii) *both* refer to "*the* at least one game object." The antecedent basis for both elements (c)(i) and (c)(ii) is in element (c)—"at least one of *a plurality* of game objects." "[T]he at least one game object" in elements (c)(i) and (c)(ii) refer to the same game object; there is no reason that they must be in any particular order.

Second, Big Viking Games points to two sections of the specification that it argues support its proposed construction—column 5, lines 30-38 ("In the context of a

game environment advantage, the game designer controls the resources of the game" and "[the] advantage provider can decide the nature and extent of such control based on any number of factors such as cost"), and column 3, lines 23-25 ("the price of a desired environment feature and/or element become[s] incrementally lower with increased purchase of offered environment features and/or elements"). These sections of the specification, however, do not require that the steps of claim 1(c) be performed in order. Column 5, lines 30-38 merely notes that the advantage provider can control game resources based on factors such as cost. Column 3, lines 23-25 relates to an unclaimed feature in which "incentives" are provided by prices becoming incrementally lower with increased purchases. In the latter embodiment, the only requirement is that the price be lowered at or before the time that a subsequent purchase of the same object is made.

Accordingly, in regards to the order of steps in claim 1, element (c)(ii) must precede (c)(iii). There is no requirement that any other cited elements be performed in any particular order.

## 2. Order of Steps in Claim 15

The parties dispute whether the claim elements 15(c)-(e) must be performed in the order they appear. The Court's adopted construction is highlighted.

| Term | GameTek's Proposed Construction | Big Viking Games's Proposed Construction |
|---|---|---|
| Claim elements 15(c)-(e) | **order of claim elements: Claim element 15(d) must precede 15(e). There is no requirement that any other cited elements be performed in any particular order.** | **order of claim elements:** Claim elements 15(c)-(e) must be performed in the order they are written. |

1    Claim 15 provides:

2
      A method . . . using a programmed computer to effect the following steps:
3     . . .
      c) enabling the at least one user to select at least one of a plurality of game
4     objects;
      d) setting the purchase price of the at least one game object;
5     e) comparing the account balance with the set price of the at least one
      game object and, determining if the at least one user's account balance is not less than
6     the set price, then the at least one user is eligible to purchase the one
      selected game object.
7

8    (*Id.* at 13:34-51.)

9         The parties agree that the dispute over the order of steps for claim 15 is the same

10   as the dispute over the order of steps for claim element 1(c), discussed above.  (Pl. Op.

11   Br. at 24; Def. Op. Br. at 24.)  Accordingly, in regards to the order of steps in claim 15,

12   element (d) must precede (e).  There is no requirement that any other cited elements be

13   performed in any particular order.

14                    **3.  Order of Steps in Claim 17**

15        The parties dispute whether the claim elements 17(d)-(f) must be performed in

16   the order they appear.  The Court's adopted construction is highlighted.

17

18
19
| Term | GameTek's Proposed Construction | Big Viking Games's Proposed Construction |
20   |------|--------------------------------|------------------------------------------|
| Claim elements 17(d)-(f) | No construction necessary because this is an issue of infringement rather than claim construction. Nonetheless, there is no requirement that Claim 17, elements (d), (e), and (f) must be performed in order. | **order of claim elements:** Claim elements 17(d)-(f) must be performed in the order they are written. |
21
22
23
24

25

26

27

28

1   Claim 17 provides:

2

3   A method . . . using a programmed computer to effect the following steps:
    . . .

4   d) permitting the at least one user to select one or more of the plurality of
    the displayed game objects, each game object having a set price;

5   e) determining if the at least one user has sufficient consideration in its
    account to purchase the selected one game object and to provide an

6   indication thereof.
    f) presenting to the at least one user an offer to purchase the game object

7   dependant upon a group of game parameters comprising the tracked
    activity of the at least one user, and the indication that the one user has

8   sufficient consideration in its account to purchase the selected game
    object at the set price[.]

9

10  ('445 patent, at 14:7-31.)

11       The Court finds that claim elements 17(d)-(f) must be performed in the order that

12  they are written.  First, claim element 17(d) requires the system to permit the user to

13  "select one or more of the plurality of the displayed game objects." (*Id.* at 14:20-21.)

14  In addition, claim element 17(d) adds that "each game object [has] a set price." (*Id.* at

15  14:21-22.)  Claim element 17(e) then determines whether the user has sufficient

16  consideration to purchase "*the selected* one game object," and provides an indication

17  of whether the user has sufficient consideration.  (*Id.* at 14:24-25.)  Claim element

18  17(e) must follow claim element 17(d) because the game object in claim element 17(e)

19  has already been "selected," as indicated by the use of the past participle.  A user must

20  select an object (claim element 17(d)) before the system can determine whether the user

21  has sufficient consideration to purchase the "selected" object (claim element 17(e)).

22       Second, claim element 17(f) necessarily comes after claim elements 17(d) and

23  (e).  Claim element 17(f) requires the computer to "present . . . an offer to purchase the

24  game object dependent upon . . . the indication that the one user has sufficient

25  consideration . . . to purchase the selected game object at the set price." (*Id.* at 14:26-

26  31.)  This must necessarily come after claim elements 17(d) and (e), because claim

27  element 17(f) specifically requires that the offer be presented "dependent upon" the

28

"indication that the one user has sufficient consideration" from claim element 17(e). In addition, the game object must already be "selected" in claim element 17(f), which requires it to follow claim element 17(d).

Accordingly, claim elements 17(d)-(f) must be performed in the order they are written.

## CONCLUSION

For the reasons stated above, the terms at issue shall be construed as indicated above.

**IT IS SO ORDERED.**

DATED:  February 12, 2014

_____
Hon. Roger T. Benitez
United States District Judge

12-CV-501